RECEIVED
IN LAKE CHARLES, LA

AUG - 9 2005
Pam
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| STEVEN T. ROSS | : | DOCKET NO. 03-1237 |
| VS. | : | JUDGE MINALDI |
| PORTHAU INDUSTRIES AND ALBRET DOCKS | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Currently before the court is a Motion for Summary Judgment [doc. 33] filed by Pourteau Industries[1] and Albret Docks, S.A. (Collectively "Albret Docks"). The plaintiff, Steven T. Ross, has filed an opposition and Albret Docks has filed a reply.

Summary Judgment Standard

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986). When the nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with

---

[1] The caption states "Porthau", the defendants, in their brief, say "Pourteau."

affidavits, that demonstrate the absence of a genuine issue of material fact. [2] *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden. See *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2555.

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *Eastman Kodak v. Image Technical Services*, 504 U.S. 451, 456-58, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. However, a party opposing summary judgment may not rest on mere conclusory allegations or denials in his pleadings. Fed.R.Civ.P. 56(e); see also *Topalian*, 954 F.2d at 1131.

## Facts

Porteau Industries and Albret Docks are foreign corporations, with principal places of business in France.

The plaintiff, Steven Ross, is a resident of Louisiana, who has been an employee of EADS Aeroframe Services, L.L.C., ("EADS") since January, 27, 2003. Ross was working as a mechanic

---

[2] FN1. A "material" fact is one that might affect the outcome of the suit under the applicable substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In order for a dispute to be "genuine," the evidence before the Court must be such that a reasonable jury could return a verdict for the nonmoving party. *Id.*, see also, *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir.1992).

on an Airbus A310 aircraft when he was injured in a work-related accident on April 28, 2003. Ross was injured when he fell from an aircraft "docking station." The docking station from which Ross fell is a component of a "docking system" specifically designed and manufactured for use with Airbus A300 and A310 aircraft by Albret Docks.

Ross was injured when he fell from a docking station when one of the sliding panels slid out from under him as he stepped from the aircraft onto the docking station.

Ross was working in the front cargo hold, lower level, of the Airbus A310 aircraft at the time of his accident.

Pursuant to a written agreement between Albret Docks and EADS, the docking systems were designed to be manufactured in compliance with European safety standards. Prior to the shipment of the docking systems from their place of manufacture in France, the docking systems were inspected by Norisko Equipment on June 11, 2002, an independent testing company, to insure compliance with European safety standards. Albret alleges that the report of Norisko Equipment for the docking station indicates that the docking station was fully compliant with European safety standards.[3]

The docking systems were delivered unassembled to EADS in Lake Charles, Louisiana, prior to February 2003.

Albret alleges that upon receipt of all the docking system components in February 2003, they were inspected without installation around an aircraft. Minor modifications were noted, none dealing with the sliding panel docking stations. A temporary final assembly acceptance report dated

---

[3] The plaintiff states that he does not have enough information to admit or deny this allegation.

February 20, 2003, was signed by Mr. Clause Sarron for Albret and Mr. Alain Bonnet for EADS.[4]

After completion of the minor modifications noted in the February report, the docking systems were inspected and a final acceptance report was issued on March 31, 2003, signed by Mr. Girard Dussaut for Albret and by Mr. Alain Bonnet for EADS.[5]

Albret alleges that the inspection in March included assembly of an entire docking system around an Airbus aircraft and included training for EADS mechanics showing the proper positioning of the various docking stations around the aircraft and the importance of using the correct docking station at the correct location on the aircraft. Ross denies that EADS employees received this training.

Albret further alleges that operations manuals containing detailed drawings of the various docking stations and their proper placement around the Airbus aircraft were provided to EADS by Albret prior to the March 2003 assembly, testing and training.[6]

Albret alleges, and Ross denies, that the correct placement of the docking stations after the March 2003 assembly, testing, and training was the responsibility of the owner of the docking systems, EADS.

Albret alleges, and Ross denies, that the docking station being used at the front cargo hold on April 28, 2003, was not designed nor manufactured for high volume use and/or excessive weight.

---

[4] The plaintiff states that he does not have enough information to admit or deny this allegation.

[5] The plaintiff states that he does not have enough information to admit or deny this allegation.

[6] The plaintiff states that he does not have enough information to admit or deny this allegation.

4

As many as ten aircraft mechanics, including Steven Ross, were working in the front cargo hold on April 28, 2003, with repeated trips in and out of the cargo hold with parts and supplies.

Ross alleges that the docking station from which he fell was defective. Albret denies this allegation.

Law and Analysis

Ross alleges that Albret is liable under the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 *et seq.*, which establishes the exclusive theories of liability for manufacturers for damage caused by their products. La. R.S. 9:2800.52; *See also, Jurls v. Ford Motor Co.*, 32,125 (La.App.2d Cir.01/06/00), 752 So.2d 260. In the instant case, the plaintiff is basing his claim on two theories of liability under the LPLA: that the platforms were unreasonably dangerous in design and unreasonably dangerous because an adequate warning was not provided.

A manufacturer is liable for damages proximately caused by an unreasonably dangerous product when the damages arose from a reasonably anticipated use of the product. La. R.S. 9:2800.54(A). The availability of an alternative design is relevant only if the user was engaged in a reasonably anticipated use of the product. *Butz v. Lynch*, 1999-2070 (La. App. 1st Cir. 6/23/00), 762 So.2d 1214, 1217-1218. "Reasonably anticipated use" is defined as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. R.S. 9:2800.53(7); *Marks v. OHMEDA, Inc.* 871 So.2d 1148, 1157, 2003-1446, **11 (La.App. 3 Cir., 2004). The standard for determining reasonably anticipated use is objective. Furthermore, it is from the point of view of the manufacturer at the time of manufacture. *Daigle v. Audi of America, Inc.*, 598 So.2d 1304 (La.App. 3d Cir.1992).

A "foreseeable use" is not equivalent to a "reasonably anticipated use." *Delphen v. Dept. of*

*Transp. & Dev.*, 657 So.2d 328 (La.App. 4th Cir.1995); *Sturlese v. Six Chuter, Inc.*, 822 So.2d 173, 180, 2001-1634, **10 (La.App. 3 Cir., 2002). "Reasonably anticipated use" will also be more effective than "normal use" in conveying the important message that the manufacturer is *not* responsible for accounting for every *conceivable foreseeable use*. It is foreseeable that a consumer might use a soft drink bottle for a hammer, might attempt to drive his automobile across water or might pour perfume on a candle to scent it. If he does, however, the manufacturer of the product should not be and under the LPLA is not liable because the uses in the illustrations are not the sort that a manufacturer should reasonably expect of an ordinary consumer. *Myers v. American Seating Co.*, 637 So.2d 771, 775-776 (La.App. 1 Cir.,1994).

A product may be deemed unreasonably dangerous due to its composition or construction, its design, the manufacturer's failure to provide an adequate warning, or the product's failure to conform to an express manufacturer's warranty. La. R.S. 9:2800.54(B); *Ashley v. General Motors Corp.*, 27,851 (La.App.2d Cir.01/24/96), 666 So.2d 1320. The plaintiff bears the burden of proving the alleged defect. La. R.S. 9:2800.54(D); *Jurls, supra; Ashley, supra.*

LSA-R.S. 9:2800.56 provides that a product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
>
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

LSA-R.S. 9:2800.57 sets forth the circumstances under which a product is unreasonably dangerous because of an inadequate warning:

> A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
>
> B. A manufacturer is not required to provide an adequate warning about his product when:
>
> (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
>
> (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
>
> C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

The LPLA defines "adequate warning" in LSA-R.S. 9:2800.53(9) as follows:

> [A] warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.

Albret submits that the subject docking stations are designed and manufactured to exacting standards for use at specific, pre-determined locations around the aircraft. Albret designed and manufactured two comprehensive docking systems for EADS. One system was for use with the

Airbus A320 aircraft and the other was for use with the Airbus A300/310 aircraft. Each docking system was comprised of individual "docking stations" for use by maintenance personnel at specific locations around the designated aircraft.

Albret further contends that it provided a detailed operation manual and engineering drawings to EADS. The engineering drawings allegedly show the correct placement of fuselage and wing docks, and the correct sequence of setup.[7] Albret alleges that training on the correct placement of these docks around an A310 aircraft was provided to EADS by Albret prior to Ross's accident.[8]

The correct system dock for use at the front cargo hold of the A310 aircraft is the "1R Fuselage Dock."[9] Detailed drawings for the A300 Series aircraft's docking system were provided to EADS by Albret prior to the plaintiff's accident.[10] The Operations Manual and drawings indicate that the correct docking station for the plaintiff's work area is the "1R Right fwd. fuselage dock." This is a two-tiered, fixed platform to allow entry into the front (forward) cargo hold. It contains no inbound sliding panels and is designed for heavier usage than the wing (engine) docks.[11]

When the plaintiff fell, he was on a docking station that had been secured in place with locking pins. Albret contends that the only docking station which fits this description is the "Engine

---

[7] See "Docks Fuselage A310," "Wing Docks- A310" and "Docks Set Up - A310", Albret's response to plaintiff's Request for Production of Documents attached as Exhibit B to Albret's Motion for Summary Judgment.

[8] See Declarations of Girard Dussaut and Claude Sarron, attached as Exhibits F and G to the Motion for Summary Judgment.

[9] See "Docks Fuselage A310", Exhibit B to Motion for Summary Judgment.

[10] See Declarations of Alain Bonnet, Girard Dussaut and Claude Sarron.

[11] See Exhibit H attached to Motion for Summary Judgment.

8

dock F."[12] This docking station is specifically designed with sliding panels to adjust to the curvature of various makes of engines which may be found on an A310 aircraft.[13] Albret alleges that this docking station was not designed for the heavier usage encountered around a cargo hold. The plaintiff admitted that he had been in and out of the cargo hold with equipment five to ten times prior to his accident and that there were five to ten other mechanics working at the time in the same cargo hold.[14]

There is no question that the incorrect docking station was being used at the time of the accident. The key question is whether Albret could have reasonably anticipated that the wrong docking station would be used at the cargo hold door. Albret unequivocally argues that it could not have reasonably anticipated this use. The plaintiff argues that Albret should have reasonably anticipated that the docks would be used in different positions.

Reasonably Anticipated Use

The plaintiff argues that every aircraft must be downjacked at some point during the maintenance process. The aircraft must be downjacked and removed from the hangar for the engine to be started, otherwise there would be too much heat and noise from the jet engines. The primary reason that an aircraft is jacked up is to perform maintenance on the landing gear. It takes about

---

[12] See Exhibit I attached to Motion for Summary Judgment.

[13] See February 6, 2004 deposition of Steven Ross, pp. 75-77, attached as Exhibit J to Motion for Summary Judgment; See also affidavit of Steve Mobley, attached as Exhibit E to Motion for Summary Judgment.

[14] See February 6, 2004 deposition of Steven Ross, pp. 124-125, attached as Exhibit J to Motion for Summary Judgment.

9

eight hours for a full shift of workers to downjack an aircraft.[15]

The 1R dock cannot be used when the aircraft is in the downjacked position. The height of the 1R dock cannot be adjusted.[16] Other components of the scaffolding system (such as the wing stands) can be raised and lowered.[17] Because of the height of the 1R dock, this unit of the scaffolding system would be in the way of the cargo door and would be too high to provide access to the cargo door when an aircraft is in the downjacked position.[18]

When an aircraft is downjacked, it is still necessary to use some type of scaffolding device to access the aircraft.[19] Therefore, EADS employees used the F dock when an aircraft was downjacked.[20] Approximately 25% of the maintenance work done on any aircraft at the EADS facility is done while the aircraft is downjacked.[21] Therefore, the plaintiff argues that EADS's use of the scaffold should have been reasonably anticipated by the manufacturers. Albret counters by stating that, in the General Characteristics section of the Operation Manual[22] supplied to EADS by the defendants, which is written in French and English, it states that "each dock is fitted with 4

---

[15] Johnson deposition, Plaintiff exhibit 10, pp. 21-22, 52-56; Mobley deposition, Plaintiff exhibit 9, pp. 69-70.

[16] See Troy Mellum deposition, Plaintiff Exhibit 8, pp. 55.

[17] Mobley deposition, Plaintiff's Exhibit 9, p. 52.

[18] Johnson deposition, Plaintiff exhibit 10, pp. 21,45; Mobley deposition, Plaintiff exhibit 9, pp.33, 37; Gray deposition, Plaintiff exhibit 5, p. 53.

[19] Johnson deposition, Plaintiff exhibit 10, p.45.

[20] Johnson deposition, Plaintiff exhibit 10, p.29.

[21] Mobley deposition, Plaintiff's Exhibit 9, p. 85.

[22] Exhibit D to MSJ.

stabilising [sic] jacks, lockable during working operations." The drawing of the 1R Dock[23] clearly shows the four stabilizing jacks which would allow the 1R dock to be raised and lowered.

Albret alleges that it provided on-site training to EADS personnel in Louisiana after the docking systems were delivered and inspected. An integral part of this training was the correct placement of the various docking systems around an A310 aircraft.[24] Ross alleges that communication with Sarron and Dussaut was difficult due to the language barrier.[25] Steve Johnson testified that he did not receive any written or printed instructions on the assembly of the scaffolding system. The only drawings he received were labeled in French and used metric measurements.[26] According to Johnson, Ogeron, and Mobley, Sarron and Dussaut spoke only broken English.[27] Dussaut showed Mobley a magazine showing the docks assembled around an aircraft, but the magazine was in French.[28]

Orgeron was a lead mechanic for EADS. According to Ross, he testified that no one ever told him that these scaffolds could not be used in different positions around the aircraft.[29] An affidavit signed by Orgeron states:

---

[23] Exhibit H to MSJ.

[24] See Declaration of Alain Bonnet; Declaration of Claude Sarron; November 22, 2004 deposition of Alain Bonnet, pp. 28-31; Declaration of Girard Dussaut.

[25] The court nots that EADS provided their employee, Alain Bonnet, originally from France, to work with Dussaut and Sarron.

[26] Johnson deposition, p. 14.

[27] Johnson deposition, p. 15; Ogeron deposition, p. 37; Mobley deposition, p. 21.

[28] Mobley deposition, p. 54.

[29] Orgeron deposition, p. 16-18.

11

> Albret Docks and/or Porteau Industries provided detailed blueprints (drawings) with the docking systems, which showed how the various individual docking stations comprising the docking systems were to be placed around the aircraft. These blueprints (drawings) clearly showed the correct location of each docking system for placement around the aircraft. These blueprints (drawings) were provided to me by Mr. Allain Bonnet of EADS, who was the EADS representative at that time responsible for purchasing these docking systems.

The affidavit continues by discussing how the different docking stations fit the aircraft, noting that the fixed platform fuselage docks are for the cargo holds.[30]

Mark McGrew was the safety and security manager at EADS. He testified that no one ever told him that a certain type of platform was to only be used to access an engine versus a cargo hold. McGrew also testified that he was unaware of any training provided by the manufacturer regarding the proper placement of the scaffolds, and that certainly no training was given to him.[31]

Troy Mellum, an airframe mechanic for EADS, testified that the docks were not stenciled "engine" or "cargo." He could not tell by looking at a diagram where the docks were supposed to go.[32]

Steve Mobley, an aircraft mechanic for EADS, participated in the reassembly of the docks at the EADS facility. Ross stated that he testified that he never received any instructions when he was assembling the docks with regard to where they should be placed around the aircraft. He further testified that the only drawings the French manufacturer's representative gave him were blueprints telling him how to assemble the pieces and these were in French. He never received any drawings

---

[30] Orgeron affidavit, Exhibit C to MSJ.

[31] McGrew deposition, pp. 36, 51.

[32] Mellum deposition, pp. 15-17.

showing the placement of the docks around the aircraft.[33] Albret submitted an affidavit signed by Mobley that contains the same language as the affidavit described hereinbefore executed by Orgeron. He acknowledges that Albret gave them detailed drawings and instructions with regard to the placement of the docks.

Steve Johnson, an airframe mechanic for EADS, also helped to reassemble the docks. Ross states that he testified that Sarron and Dussaut never said the docking stations could not be used in different places around the aircraft. They did say that some of the pieces of the docking system could be interchanged, although they did not specify which pieces these were. Johnson testified that no one from the manufacturer ever told him that Engine Dock F could not be used elsewhere around the aircraft.[34] Albret submitted an affidavit signed by Johnson that contains the same language as the affidavit described hereinbefore executed by Orgeron. He acknowledges that Albret gave them detailed drawings and instructions with regard to the placement of the docks.

Alain Bonnet testified that he is not aware of any instructions in the operator's manual prohibiting the docking stations from being used at different locations on the aircraft and it was his belief that the docking stations would fit other locations.[35] Bonnet also testified in his Declaration that "Acceptance in March 2003 included training for EADS' Lake Charles personnel showing proper positioning of the various docks comprising the docking systems (i.e., maintenance, tail, wing, engine, nose and fuselage docks) around an A310 aircraft and the importance of using the

---

[33] Mobley deposition, pp. 13, 18.

[34] Johnson deposition, pp. 18, 20, 80.

[35] Bonnet deposition, p. 14.

correct dock at the correct location on the aircraft."[36] Bonnet stated that Operations Manuals were supplied and that these manuals served as the basis for the correctly positioning the docks around the aircraft.[37]

Martin Redmond, an EADS supervisor in charge of engineering, tooling, ground support equipment and planning, testified that it was certainly possible for the docks to be used in different locations around the aircraft and that there was nothing in any of the material furnished by the manufacturer prohibiting this practice.

Albret representatives testified that they provided on-site training after the docking systems were delivered and inspected. An integral part of this training was the correct placement of the docking stations.[38] Upon receipt and acceptance of these docking systems, EADS then assumed the responsibility to train their own employees on the correct use of the systems. Ross, the plaintiff, admitted that he had received some training from EADS on how to set up the system.[39]

The plaintiff also argues that, even if EADS employees were warned not to use the F Dock at the cargo hold, the use of the dock at this location was not the cause of Ross's injury. Ross alleges that the cause of injury was the defective product. Albret contends that the cause of Ross's accident was the improper placement of the F dock at the cargo door, "because the F dock is not intended for

---

[36] Bonnet Declaration, ¶12.

[37] Bonnet Declaration, ¶16.

[38] See Declarations of Girard Dussaut and Claude Sarron, attached as Exhibits F and G to the Motion for Summary Judgment.

[39] February 6, 2004, deposition of Steven Ross, p. 78, lines 3-19, Exhibit J to MSJ.

14

use in an area where workers will frequently be stepping on and off a scaffold."[40] This is a misstatement of Albret's position. Albret said that the F dock was not the proper dock for use at the cargo door and that this dock was not meant to bear as much weight as the proper dock.

Albret states that the 1R dock is a fixed platform specifically designed for use at the front cargo hold of an A310 aircraft. It has no sliding panels. If the plaintiff had been using this dock on April 28, 2003 he would not have been injured. The 1R dock had been used at this location on the aircraft for 30 to 35 days prior to this date. The aircraft was then downjacked, removed from the hangar for tests and then moved back to the hangar for 9 to 10 additional days. Rather than take the time to jack the aircraft back to its standard maintenance position, EADS elected to perform this additional maintenance in the downjacked position. An F Dock was pushed into place at the cargo door because it was about the right height and it was faster and more convenient.[41]

Ross testified that the F Dock positioned at the cargo hold was experiencing much heavier usage than called for in the operational manual. Albret argues that whether the retaining pin[42] became disengaged from multiple shocks from 5 to 10 mechanics, carrying tools and equipment repeatedly in and out of the cargo hold, or because a mechanic inadvertently left the retaining pin in

---

[40] Memorandum in Opposition, p. 9.

[41] Johnson deposition, pp. 51-56; Orgeron deposition, pp.41-52; Mobley deposition, pp.67-72.

[42] The plaintiff argues that the retaining pin is defective, but this issue is not presently before the court. The question is whether the use of the incorrect door at the cargo hold could have been reasonably anticipated by the manufacturer at the time of manufacture. If the court find that this was not a reasonably anticipate use, then alternative designs need not be considered. If the court finds that is was a reasonably anticipated use, evidence about the pins and alternative designs will be an issue at trial.

the up and unlocked position, is not clear. Albret argues that it is clear that the accident would not have occurred if the 1R Dock had been used at the cargo hold door the morning of the accident.

Based upon the evidence before the court, there is no genuine issue of material fact that the use of the incorrect platform at the cargo door was not a reasonably anticipated use. There is no way that a manufacturer in France could, at the time of manufacture, reasonably anticipate that workers in the United States would use the incorrect docks at various stations around the aircraft.

Failure to Warn

The plaintiff alleges that Albret failed to provide adequate warning about the product. The plaintiff avers that the locking pins for the sliding panels were too short to properly secure the panels during usage. The plaintiff claims that Albret should have warned the users that the sliding panels could unexpectedly disengage. Albret argues that the fallacy in this position is that under normal usage, when the docks are not misused, the pins will not disengage.

Albret alleges that multiple warnings were provided to EADS concerning the importance of the correct placement of the docking systems. The Operation Manual and drawings supplied showed that sliding panel docks, such as the wing (engine) dock from which the plaintiff fell, are not to be positioned at the front cargo hold. Albret also contends that they instructed EADS as to the correct docking positions. If EADS did not properly train their personnel, negligence cannot be imputed to Albret.

The phrase "duty to warn" can be misleading because it tends to focus attention on the reasonableness of defendants in failing to give a warning and strict liability should not focus on the question of fault. This is the basis for the distinction in *Halphen v. Johns-Manville Sales*

*Corporation*, 484 So.2d 110 (La.1986)[43] between products which are "unreasonably dangerous per se" and those strict liability cases based on failure to warn of *foreseeable dangers*. In the latter, a balancing test is used to determine whether the manufacturer could have reasonably known of the danger and should have issued a warning. *Hunt v. City Stores, Inc.*, 387 So. 2d 585 (La. 1980).

> A manufacturer is not required to provide an adequate warning when:
> (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
> (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
> La. R.S. 9:2800.57(B).

A manufacturer's duty to warn does not include warnings concerning dangers that are or should be obvious to the ordinary user. *Jaeger v. Automotive Cas. Ins. Co., supra.* Additionally, those who are "sophisticated users" of a product may be presumed to know about the danger presented by the product due to their familiarity with it. *Mallery v. International Harvester Co.*, 96-321 (La.App. 3d Cir.11/6/96), 690 So.2d 765, *writ denied,* 97-1323 (La.9/05/97), 700 So.2d 512; *Johnston v. Hartford Ins. Co.*, 623 So.2d 35 (La.App. 1st Cir.1993), *writ denied* 626 So.2d 1170 (La.1993); *Welch v. Technotrim, Inc.*, 778 So.2d 728, 735, 34,355 , **11 (La.App. 2 Cir., 2001).

There is no duty to warn "sophisticated users" of the dangers, which they may be presumed to know about because of their familiarity with the product. *Contranchis v. Travelers Ins. Co.*, 839

---

[43] Some of the principles established in *Halphen* were legislatively overruled by the Louisiana Products Liability Act, Acts 1988, No. 64. The effective date of this act was September 1, 1988 and has no bearing on this case.

So.2d 301, 304 (La.App. 5 Cir., 2003).[44] Albret contends that it cannot be disputed that EADS is a sophisticated user of the docking systems. The burden is on Albret to prove that EADS is a sophisticated user.[45] The record is not sufficient to establish this issue. There is no evidence of how many times EADS has purchased this or similar docking systems.

The court need not find that EADS is sophisticated user because a manufacturer's duty to warn does not include warnings concerning dangers that are or should be obvious to the ordinary user. It should be obvious to an ordinary user that it is necessary that one use the proper docking system at the corresponding door on the aircraft. For this reason Albret did not have a duty to warn and summary judgment will be granted.

Lake Charles, Louisiana, this ___ day of August, 2005.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[44] *Home Ins. Co. v. National Tea Co.*, 577 So.2d 65, 74 (La.App. 1st Cir.1990), *affirmed in part, reversed in part* (on other grounds), 588 So.2d 361 (1991); *Ducote v. Liberty Mut. Ins. Co.*, 451 So.2d 1211, 1213 (La.App. 4th Cir.), *writ denied,* 457 So.2d 15 (La.1984).

[45] *Swope v. Columbian Chemicals Co.*, 281 F.3d 185 (5th Cir. 2002).